UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MARY MATUTAT,

Plaintiff,

-vs-                                                        Case No.  6:06-cv-30-Orl-31JGG

COMMISSIONER OF SOCIAL
SECURITY,

Defendant.

---

## REPORT AND RECOMMENDATION

### TO THE UNITED STATES DISTRICT COURT

Plaintiff Mary Matutat ["Matutat"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] determining that there was medical improvement in her condition and that her disability had ceased effective July 1, 2002, with benefits terminating as of September 20, 2002. *See* Docket No. 11 (Plaintiff's brief). For the reasons set forth below, the Commissioner's decision should be reversed or, alternately, remanded for further proceedings.

### I.    PROCEDURAL HISTORY

In May 1995, an administrative law judge (ALJ) found Matutat disabled as of December 1992. R. 27-38.  At that time, Matutat claimed that she suffered from depression and panic attacks two to three times per week, with residual headaches. R. 30, 32. The ALJ further found that Matutat's drug addiction was a contributing factor material to her disability. R. 33.

The Commissioner reevaluated Matutat's condition in 1998, and an ALJ determined she was still disabled. R. 40-52. The ALJ found that Matutat suffered from bipolar disorder, cervical strain with muscle spasm and decreased range of motion, and had a history of drug and alcohol dependence. R. 47. The ALJ further found that Matutat's history of polysubstance abuse was not a material factor contributing to her disability and that she was disabled without regard to that disorder due to her mental illness. R. 48.

The Commissioner again evaluated Matutat's continuing disability in 2002. The Disability Hearing Officer determined that there had been medical improvement in her condition and that her disability ceased as of July 1, 2002, and her benefits terminated on September 1, 2002. R. 58-79. Matutat requested a hearing, which was held on January 14, 2004, before the Honorable Albert D. Tutera, ALJ, in Orlando, Florida. R. 80; 382 - 398. Matutat waived her right to representation at the hearing. R. 384-85. The ALJ heard testimony from Matutat only.

On April 5, 2004, the ALJ issued a decision that Matutat was not disabled and not entitled to benefits. R. 11-21. Following a review of the medical and other record evidence, the ALJ found that Matutat could not perform her past relevant work as a cashier, supervisor, assistant manager and girl Friday. R. 18, 20 Finding 8. The ALJ found that Matutat nevertheless retained the residual functional capacity ["RFC"] to perform unskilled light work. R. 20, Finding 9. Applying the Medical-Vocational Guidelines, the ALJ concluded that Matutat was not disabled. R. 20, Finding 12.

The Appeals Council denied review on November 2, 2005. R. 4-7. On January 9, 2006, Matutat timely appealed the Appeals Council's decision to the United States District Court. Docket No. 1. On July 18, 2006, Matutat filed in this Court a memorandum of law in support of her appeal.

-2-

Docket No. 11.  On September 18, 2006, the Commissioner filed a memorandum in support of her decision that Matutat was not disabled.  Docket No. 12.  The appeal is ripe for determination.

## II.     THE PARTIES' POSITIONS

Matutat assigns four errors to the Commissioner.  First, Matutat claims that the Commissioner erred in failing to review the medical evidence supporting the previous finding of disability when comparing her prior condition with her condition at the time of review to determine whether her condition had improved.  R. 7-8.  Second, Matutat claims that the Commissioner erred by relying solely on the grids when Matutat had a nonexertional impairment.  R. 9.  Third, Matutat claims that the Commissioner erred in failing to properly consider her limitations.  R. 10.  Fourth, Matutat claims the ALJ failed in his responsibility to fully and fairly develop the record.  R. 10-11.

The Commissioner argues that substantial evidence supports her decision to deny disability.  First, the Commissioner argues that the ALJ's review of prior ALJ decisions suffices and he need not review the evidence supporting those decisions.  Docket No. 12 at 6.  Second, the Commissioner argues that use of the grids was appropriate in this case.  Docket No. 12 at 8-9.  Third, the Commissioner argues that the ALJ properly considered her limitations.  Docket No. 12 at 9.  Finally, the Commissioner argues that the ALJ had no duty to request medical records when Matutat stated she would file additional records after the hearing but failed to do so.

## III.    THE STANDARD OF REVIEW

### A.     AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a

reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

## B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already

considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.   REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under

sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also, Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings

of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735 - 36.

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

## B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520©). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in

-8-

the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), ©). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.   OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote*, 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).

In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);  *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue: 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### F.     CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62; *Jones v. Dep't of Health and Human Services,* 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62; *Cannon v. Bowen,* 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker,* 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater,* 67 F.3d at 1562 (quoting *Tieniber v. Heckler,* 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

## H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands

(stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy

-17-

and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

## V.      APPLICATION AND ANALYSIS

### A.      THE FACTS

The ALJ's decision dated April 13, 1998, reflected that Matutat complained of major depression with psychotic features, bipolar disorder, anxiety attacks, mood swings, migraine headaches, inability to sleep, fatigue, carpal tunnel syndrome in both hands, and auditory hallucinations. R. 44. The ALJ's decision further summarized the various medical records presented for review. R. 44-45. The ALJ concluded that Matutat's impairments of bipolar disorder, history of drug and alcohol dependence, cervical strain with muscle spasm and decreased range of motion were "severe," but not not so severe that they met or equaled the severity of any impairment listed in Appendix 1, Subpart P, Regulations No. 4. R. 46-47. The ALJ further concluded that Matutat had physical problems that limited her to sedentary level lifting and light level walking and standing. R. 46. Given her mental condition, however, the ALJ determined Matutat lacked the capacity to perform work effectively at all levels, and that she could not perform her past prior work. R. 46. Nor did Matutat have transferable skills to perform other work within her RFC. R. 46.

At the time of ALJ Tutera's decision, Plaintiff was 43 years old. She has a high school education, plus one and one-half years of college. R. 385. Medical records after the prior ALJ's decision dated April 13, 1998, reflect the following:

On July 20, 1998, an individualized service plan from Act Corporation reflected that Matutat's mood did not maintain balance and that she exhibited temper outbursts, poor impulse control and judgment. R. 328. Goals were set for Matutat to not use crack cocaine at all, to continue taking her prescription medications on a daily basis, and to attend group therapy. *Id.*

-19-

On October 22, 1998, Dr. Loray Blair-Britt saw Matutat for right shoulder pain and left thumb pain. R. 177. Dr. Blair-Britt prescribed Motrin and ordered x-rays. *Id.* At her follow-up visit on November 9, 1998, Dr. Blair-Britt noted that the x-rays were negative. Dr. Blair-Britt noted probable tendonitis of the left thumb, which may require cortisone injections, and probable rotator cuff of the right shoulder. *Id.* An MRI was ordered. *Id.*

On January 28, 1999, Matutat requested that Dr. Blair-Britt refill of her Motrin prescription for periodic shoulder pain. R. 176. Matutat indicated the Motrin "helps greatly." *Id.* Dr. Blair-Britt gave Matutat the requested refill. *Id.*

On July 9, 1998, Matutat was admitted to the Leon F. Stewart/Hal. S. Marchman Center as a result of relapse history of crack cocaine. R. 151. Matutat reports that she is a crack binger and will abstain for 1.5 months and then smoke $300-400 worth of crack overnight. *Id.* Her DSM IV[2] diagnosis upon intake was: Axis I: 304.30 Crack dependence, severe, with physiological dependence; 305.20 Marijuana abuse, mild; 303.90 Alcohol dependence, severe, in full sustained remission; 304.20 HCL Cocaine Dependence, severe, in full sustained remission; Axis II diagnosis deferred; Axis III: irregular menses; Axis IV: chemical dependency, depression (per Matutat); Axis V: GAF 65.[3] She was admitted to outpatient treatment on July 23, 1998. R. 152, 160. During treatment, Matutat had

---

[2] DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) ["DSM-IV"].

[3] The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF score of 61-70 shows "some mild symptoms (e.g., depressed mood or mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

another relapse on October 12, 1998. *Id.* Matutat was discharged on January 21, 1999, with the same diagnosis as at intake. R. 151-52. Matutat's aftercare plan was to attend AA/NA meetings. R. 152.

On November 5, 1999, Dr. Blair-Britt saw Matutat for shoulder pain. R. 170. Matutat explained that she was in a residential program, and the counselor forced her to dispose of her Vicodin. *Id.* Matutat said the Vicodin helped relieve the pain, which was now radiating to her mid-back. *Id.* Dr. Blair-Britt prescribed Vicodin and referred Matutat to an orthopedist, although Matutat said she was unwilling to see one at that time. *Id.*

X-rays of the thoracic spine on November 29, 1999, were unremarkable. R. 182. X-rays of the lumbar spine on November 29, 1999, revealed minimal degenerative disc changes with no spondylosis or spondylolisthesis. R. 183.

Matutat saw Dr. Blair-Britt on March 9, 2000, for muscle spasms. R. 170. Matutat stated that she had seen a chiropractor prior to her visit who used various modalities which provided relief. *Id.* Dr. Blair-Britt prescribed SOMA and use of a heating pad. *Id.* Dr. Blair-Britt again referred Matutat to an orthopedist. *Id.*

On August 23, 2000, a CT scan of the sinuses without contrast was performed. The scan revealed mucoperiosteal thickening with virtual closure of the right osteomeatal unit with a small amount of mucoid fluid or mucous retention cyst noted at the base of the right maxillary sinus. R. 178. The left osteomeatal unit was open and the remaining paranaeal sinuses were clear. *Id.*

Plaintiff returned to Dr. Blair-Britt on November 30, 2000 complaining of right shoulder pain and stiffness. R. 167. Her range of motion was decreased and she exhibited pain at 45° abduction. *Id.* The assessment was right rotator cuff tendinitis. *Id.* Dr. Blair-Britt prescribed Toradol and Motrin for her shoulder, and Imitrex for migraine headaches. *Id.*

-21-

On April 23, 2001, John Bolla, M.D. diagnosed Matutat with endometriosis. R. 263. Her complaints included chronic abdominal pain worse around the time of her periods. *Id.* Examination revealed mild discomfort in both lower quadrants. *Id.* A recent pelvic ultrasound demonstrated probable endometrioma of the ovaries. *Id.*

X-rays of the right hip dated April 25, 2001 revealed a normal appearing right hip. R. 283.

On August 1, 2001, Matutat presented herself at the emergency department of Memorial Hospital with complaints of right groin pain. R. 217. She was diagnosed with abdominal pain-acute endometriosis. R. 216. She was prescribed Toradol and Darvocet and was released to go home. *Id.* Matutat returned to the emergency department on September 5, 2001, with complaints of neck swelling and numbness. R. 215. She was diagnosed as having a trapezius spasm and released to go home. R. 215.

A pelvic ultrasound dated August 10, 2001 revealed multiple cysts in the left ovary measuring up to 2.1 cm in diameter. R. 282. The ultrasound also showed that the endometrium was normal in thickness. *Id.*

An individualized service plan from Act Corporation dated September 24, 2001 revealed that Matutat was diagnosed as having bipolar MRE depressed (296.30) and a GAF of 50.[4] R. 327. Matutat also was experiencing high anxiety and had difficulty controlling her life due to feeling of anxiousness. R. 326.

On November 2, 2001, the Act Corporation performed a psychiatric evaluation. R. 318-23. Matutat reported she had treated with psychiatrist Dr. Rosario since 1996, but stopped the medication

---

[4] A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). DSM-IV at 32.

that he prescribed for her four days ago because it was not helping her anymore. R. 323. Matutat reported a lot of feelings of stress, lack of sleep and irritability. *Id.* She sometimes has nightmares, hears a voice whispering to her or asking her things. *Id.* She also reported using cocaine one day the previous month and she has had about three one-day lapses since June 2001. R. 322. Matutat also admitted to abusing painkillers. *Id.* The assessment was bipolar disorder with psychotic features, polysubstance abuse in remission (304.8), cocaine abuse unspecified (305.6) and probable histrionic or borderline personality disorder. R. 320. Her GAF score was 45. *Id.*

On December 22, 2001, Matutat went to the emergency department of Memorial Health Services due to complaints of abdominal cramping and low back pain. R. 212. Matutat received Toradol and Norflex, and was discharged with directions to follow up with her primary care doctor. R. 214.

On January 17, 2002, x-rays of the lumbar spine revealed very mild degenerative disc disease at L3-L4. R. 279. A CT scan of the abdomen and pelvis performed on January 22, 2002, was unremarkable. R. 277 - 78.

On January 29, 2002, Matutat went to the emergency department of Memorial Health Systems with complaints of right hip pain and upper thigh pain. R. 207 - 08. Matutat received Toradol and Decadron and was discharged. R. 210.

Treatment notes from the Act Corporation dated March 7, 2002, revealed that Plaintiff was oriented to time, person, place and situation. Her contact with reality was good. Her memory was fair. Her insight and judgment were good. R. 313 - 15, 317.

On May 18, 2002, Steven L. Wise, Psy. D., completed a Mental Residual Functional Capacity Assessment. R. 224-41. Matutat was noted to have moderate limitations in the following areas:

ability to understand and remember detailed instructions and in the ability to carry out detailed instructions. R. 224. In terms of her functional limitations, Matutat was found to have moderate difficulties in maintaining concentration, persistence or pace and in maintaining social functioning. R. 238. Dr. Wise noted that Matutat currently had tested positive for crack. R. 226. Dr. Wise found that Matutat was capable of simple tasks, that she could read, write and follow directions, and that she would be of higher employability without the drug issue. *Id.*

On June 3, 2002, Matutat saw Brian Abrams, D.P.M., for foot pain. R. 377. Her chief complaint was severe pain and tenderness in the plantar aspect of her 1st MTP joint of her left foot, pain and discomfort in both of her arches and both the medial and lateral aspects of both ankles, left greater than right. *Id.* X-rays taken on April 17, 2002, were normal with respect to pathology but did show a bipartite medial sesamoid on the left. *Id.* The assessment was sesamoiditis left medial sesamoid; arch strain from flexible pes planus, limb length discrepancy, and over pronation; and tendonitis left medial and lateral ankle ligaments also from over pronated stance, lack of arch support and limb length differential. *Id.*

On June 10, 2002, Dr. Bolla noted that Plaintiff suffered from recurrent thoracic paravertebral spasm, and had no neurologic problems. R. 242. She had normal motion in her major joints, with no deformity and no functional loss. *Id.* Her gait and station were normal and did not need any assistive device for ambulation. *Id.* Further, Matutat could squat, walk on toes and walk on heels. *Id.*

Dr. Jack E. Pulwers, M.D., evaluated Matutat on June 26, 2002, for disability purposes. R. 300-03. Matutat presented for the evaluation due to chronic pain in her neck, shoulder, hips and low back. R. 300. Matutat reported pain in her neck and shoulders resulting from a motor vehicle accident in 1996. *Id.* Matutat stated her pain is improved with a TENS unit, ultrasound treatment, chiropractic

treatment, and her current medications; her pain was made worse by household chores and using her arms. *Id.* Matutat also reported right-sided sciatica deriving from an accident in 1985. *Id.* Matutat reported mid-lumbar pain with radiation up to the thoracic spine and down to the right buttock, and described it as a dull, nagging pain. *Id.* Matutat also reported crippling depression. *Id.* Examination of the back revealed moderate cervical and thoracolumbar paraspinal tenderness, bilateral gluteal tenderness and moderate thoracic-lumbar spasm. R. 302. The impression was bursitis of the right shoulder, right sided sciatica, L4-L5 degenerative disk disease, depression with psychotic features, bipolar disorder, posttraumatic stress disorder, migraine headaches, bursitis bilateral hips and alcohol and cocaine abuse in remission. R. 303.

On July 23, 2002, Matutat followed up with Dr. Abrams regarding her foot pain. R. 375. Matutat reported only feeling a little better. *Id.* Dr. Abrams directed Matutat to continue wearing Spenco full length arch cushions in her shoes, and adjusted her medication. *Id.* There was no change on August 13, 2002. R. 374.

On August 2, 2002, notes from Act Corporation noted that Matutat asked for an excuse not to go to work, stating that she was not ready to handle the stress. R. 310. Matutat reported she was being treated for migraine headaches and asthma. *Id.* She also reported that she had been crying lately, and was feeling tired. *Id.* She noted that she ran out of Seroquel, which helps her sleep. *Id.* Her GAF score was 40.[5]

On September 3, 2002, and September 17, 2002, Plaintiff was seen by Dr. Abrams for her complaints of pain and tenderness in the plantar aspect of her foot. She was to continue wearing

---

[5]A GAF code of 31 to 40 shows that the individual has some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. DSM-IV at 32.

Spenco full length arch cushions. R. 372 - 73. Subsequent x-rays and MRI of Matutat's feet were normal with respect to pathology, but showed a bipartite medial sesamoid on the left. R. 369. Dr. Abrams decided to try a course of injections before referring Matutat to a surgeon. R. 368-69.

On October 1, 2002, notes from Act Corporation noted that Matutat reported hearing a voice whispering her name and asking her what she is doing. R. 309. Matutat reported having more anger and attacking her boyfriend on one occasion. *Id.* Her GAF was 45. *Id.*

On October 25, 2002, Susan Conley, Ph.D., completed a Mental Residual Functional Capacity Assessment. R. 333-36. Dr. Conley noted that Matutat had moderate limitations in the ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods and the ability to sustain an ordinary routine without special supervision. R. 333. Dr. Conley also noted moderate functional limitations in maintaining social functioning and in maintaining concentration, persistence or pace. R. 347.

On November 19, 2002, Dr. Abrams referred Matutat to a surgeon for her foot pain. R. 367. Dr. Donald C. Johnson performed foot surgery on Matutat on April 29, 2003. R. 378-79. There are no further records regarding Matutat's foot condition.

On January 13, 2004, Carol L. Emery, LMFT with Flagler Counseling Center prepared a note stating that Matutat continued to participate in counseling two times per month. R. 148. Matutat reported that she continued to experience mood swings, the current mood being depression. *Id.* When depressed, she would sleep alot during the day. *Id.* Matutat also reported poor memory, which affected her ability to learn and remember new information. *Id.* She continued to take medication to treat symptoms of Bipolar I Disorder. *Id.*

On January 27, 2004, three individuals (Carolyn Stewart, ARNP, BC; Shauna Camper, BA CSIV; Terri Titus, BA/PSII) from Flagler Counseling Center signed a memo stating that Matutat was not capable of maintaining employment on a regular basis and would require treatment for at least one year. R. 381.

### B.    THE ANALYSIS

The Disability Benefits Reform Act of 1984 eliminated the presumption that a DIB recipient continues to be disabled. See 42 U.S.C. § 423(f) ("Any determination made under this section shall be made on the basis of the weight of the evidence and on neutral basis with regard to the individual's condition, without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."). After an individual is awarded disability benefits by the SSA, those benefits will cease upon a showing that there has been medical improvement related to the ability to work. 20 C.F.R. § 404.1594(a).

To determine improvement, the ALJ is "required to evaluate the medical evidence upon which [the claimant] was originally found to be disabled," and compare it with the new medical evidence. *Vaughn v. Heckler*, 727 F.2d 1040, 1043 (11th Cir.1984). The point of comparison is the most recent favorable medical decision, that is, the latest final decision involving consideration of the medical evidence and the issue of whether claimant was disabled or continued to be disabled.  20 C.F.R. § 404.1594(b)(7); 20 C.F.R. § 416.994(b)(1)(C)(vii).  If medical improvement has occurred, the next step is to compare the claimant's current RFC with his or her prior RFC to determine if the claimant's medical improvement is related to the ability to work.  20 C.F.R. § 404.1594(b)(7).

1. **Evaluation of Medical Evidence Supporting Most Recent Favorable Decision**

Matutat first argues that the ALJ failed to properly evaluate the medical evidence relating to the most recent favorable decision because the ALJ only reviewed the prior ALJ's decision and did not review the actual medical records related to that decision. Docket 11 at 8. The Commissioner acknowledges that the ALJ did not have prior medical evidence before him when he evaluated Matutat's condition. Docket 12 at 6. The Commissioner responds that the prior ALJ's decision provided a thorough and complete review of the medical records, which discussed Matutat's symptoms, signs and/or laboratory findings. The Commissioner argues that the ALJ's prior decision provided the necessary information to determine whether Matutat's condition had improved and the failure to review the underlying medical reports was harmless error. Docket 12 at 6.

The procedures for how the Commissioner determines whether a disability continues or ends are set forth in 20 C.F.R. § 404.1594. In making the comparison between the claimant's prior condition and her current condition, it is clear that the Commissioner intends the ALJ to review the "complete record of the basis for the most recent favorable medical decision," and the Commissioner has developed a detailed procedure to follow when the prior file cannot be located. 20 C.F.R. § 404.1594(c)(3)(v).[6]

---

[6] Section 404.1594(c)(3)(v) provides:

Prior file cannot be located. If the prior file cannot be located, we will first determine whether you are able to now engage in substantial gainful activity based on all your current impairments. (In this way, we will be able to determine that your disability continues at the earliest point without addressing the often lengthy process of reconstructing prior evidence.) If you cannot engage in substantial gainful activity currently, your benefits will continue unless one of the second group of exceptions applies (see paragraph (e) of this section). If you are able to engage in substantial gainful activity, we will determine whether an attempt should be made to reconstruct those portions of the missing file that were relevant to our most recent favorable medical decision (e.g., work history, medical evidence from treating sources and the results of consultative examinations). This determination will consider the potential availability of old records in light of their age, whether the source of the evidence is still in operation; and whether

When a prior file cannot be located, the Commissioner must decide whether to try to reconstruct the file if the ALJ has determined a claimant is able to engage in substantial gainful activity. *Id.* If relevant parts of the prior record are not reconstructed either because the Commissioner decides not to attempt reconstruction or because such efforts fail, "medical improvement cannot be found." *Id.*

In this case, the Commissioner has not stated that the prior file was lost, only that the ALJ has not reviewed it. In light of the directive in § 404.1594(c)(3)(v) that medical improvement cannot be found when relevant parts of the prior record are not reviewed, the Court rejects the Commissioner's harmless error argument. The ALJ has failed to perform the necessary comparison, and the Commissioner's determination should be reversed.

### 2.   **Reliance on the Grids**

Matutat also claims that the Commissioner erred by relying solely on the grids when Matutat had a nonexertional impairment. Matutat argues that her depression, migraine headaches, crying spells, feelings of tiredness, and anger were nonexertional impairments. Docket 11 at 10. Matutat points to medical evidence that she has moderate limitations in the ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods and the ability to sustain an ordinary routine without special supervision. *Id.* Matutat argues that in these circumstances, the ALJ erred by failing to obtain

reconstruction efforts will yield a complete record of the basis for the most recent favorable medical decision. If relevant parts of the prior record are not reconstructed either because it is determined not to attempt reconstruction or because such efforts fail, medical improvement cannot be found. The documentation of your current impairments will provide a basis for any future reviews. If the missing file is later found, it may serve as a basis for reopening any decision under this section in accordance with the rules in § 404.988.

testimony from a vocational expert regarding the existence of jobs in the national economy that Matutat could perform. Docket 11 at 9. The Commissioner argues that the ALJ's finding the Matutat was able to understand, remember and carry out simple instructions did not preclude exclusive reliance on the grids.

Exclusive reliance on the grids is inappropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

The ALJ found that Matutat had the mental RFC to perform unskilled work. Tr. 18. The ALJ, however, did not state whether Matutat could work in a wide range of jobs at her RFC. The ALJ's findings, therefore, are incomplete. Without complete findings, the Court cannot determine whether

the ALJ erred in failing to obtain testimony from a vocational expert. If the district court determines that reversal is unwarranted based on the ALJ's failure to review Matutat's prior file, the case should be remanded to the Commissioner pursuant to sentence four for further proceedings.

### 3.    Consideration of all of Matutat's Limitations

Next, Matutat claims that the Commissioner erred in failing to properly consider her limitations in walking and standing because of her foot condition. Docket 11 at 10. Matutat argues the ALJ improperly disregarded her testimony because there was no recent supporting medical evidence. *Id.* The Commissioner opposes this argument, analogizing this case to other cases in which the ALJ is not required to include in hypothetical questions to a VE limitations that the ALJ finds unsupported by medical evidence. Docket 12 at 9.

The Court finds that ALJ did consider Matutat's testimony regarding her limitations due to foot pain and found her testimony "somewhat exaggerated and unpersuasive of [her] inability to perform some work-related functions." R. 17.   The ALJ specifically noted the lack of any significant treatment for her foot since April 2003, and Matutat's failure to produce additional evidence when given the opportunity to do so. *Id.*

Congress has determined that a claimant will not be considered disabled unless she furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In the absence of any recent corroborating medical evidence, the ALJ did not err in failing to include Matutat's foot condition in his RFC determination.

4.      **The ALJ's Duty To Fully and Fairly Develop the Record**

Matutat's last argument is that the ALJ failed in his duty to fully and fairly develop the record

because he failed to request records from doctors that Matutat testified that she had seen recently.

Docket 11. Matutat argues that, although the ALJ gave Matutat thirty days after the hearing to submit

the additional evidence, when Matutat failed to submit the records, the ALJ had an affirmative duty

to obtain the information on his own. *Id.*

Matutat's argument ignores the fundamental principle that the claimant bears the burden of

producing evidence to support her disability claim. Applicable regulations provide:

> Obtaining evidence from your medical sources. You must provide us
> with reports from your physician, psychologist, or others who have
> treated or evaluated you, as well as any other evidence that will help us
> determine if you are still disabled. See § 416.912. You must have a
> good reason for not giving us this information or we may find that your
> disability has ended. See § 416.994(e)(2). If we ask you, you must
> contact your medical sources to help us get the medical reports. We
> will make every reasonable effort to help you in getting medical reports
> when you give us permission to request them from your physician,
> psychologist, or other medical sources.    See  §  416.912(d)(1)
> concerning what we mean by every reasonable effort.  In some
> instances, such as when a source is known to be unable to provide
> certain tests or procedures or is known to be nonproductive or
> uncooperative, we may order a consultative examination while
> awaiting receipt of medical source evidence. Before deciding that your
> disability has ended, we will develop a complete medical history
> covering at least the 12 months preceding the date you sign a report
> about your continuing disability status. See § 416.912(c).

20 C.F.R. 416.993(b).

In this case, Matutat testified that she had a medical appointment scheduled for a few days after

the hearing. R. 388. The ALJ informed her twice that he would hold the record open for thirty days

and that she needed to submit those records; Matutat agreed. R. 388, 397. Matutat has not provided

any reason for failing to submit the additional medical records when given the opportunity. Further, there is no evidence that Matutat requested the Commissioner's assistance in obtaining the records or that she gave permission to the Commissioner to request the records on her behalf. Although Matutat represented herself at the hearing, she waived her right to representation. R. 385. A claimant's waiver of the right to counsel negates any "special duty" by the ALJ to assist the claimant. *Zaldivar v. Apfel*, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000), *citing, Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). By the time Matutat filed her Request for Review by the AC, however, she was represented by a lawyer. R. 8. If Matutat required assistance in obtaining her medical records, her attorney certainly could have assisted her in that matter or could have asked for the Commissioner's assistance.

This case is analogous to *McCloud v. Barnhart*, 166 Fed. Appx. 410 (11th Cir. Jan. 25, 2006). In *McCloud*, the claimant waived her right to counsel at the hearing. *Id.* at 416. On appeal, the claimant argued, *inter alia,* that the ALJ failed to develop a full a fair record because he failed to obtain records of several hospital visits. *Id.* at 417. The Eleventh Circuit noted that although the regulations provide that the Commissioner will develop a complete medical history for the 12 month period preceding the application, it is the claimant's responsibility to produce evidence to support her application. *Id.* at 418. The ALJ, therefore, did not fail to fully and fairly develop the record by failing to subpoena the claimant's medical records and the claimant never signed a release authorizing release of her records. *Id.*

The Court finds that the ALJ fulfilled his duty in this case to fully and fairly develop the record regarding Matutat's medical condition.

## VI.    **CONCLUSION**

For the reasons stated above, the Court recommends that the decision of the Commissioner be

reversed. Alternately, the case should be remanded pursuant to Sentence Four for further proceedings.

Failure to file written objections to the proposed findings and recommendations in this report

pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall

bar an aggrieved party from a *de novo* determination by the district court of issues covered in the

report, and shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** this ⁱᵗday of January, 2007.

Donald Paul Dietrich
United States Magistrate Judge

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable Gregory A. Presnell
United States District Judge

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Nadine DeLuca Elder, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL                33602

The Honorable Albert D. Tutera
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL          32817